UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------X
THE HEWLETT PACKARD COMPANY,

                                            Plaintiff,                06 Civ. 0390 (RPP)

                - against -                  **OPINION AND**
                                                                       **ORDER**

THE COMPUTER SPECIALISTS, INC.,

                                            Defendant.

-------------------------------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.**

       On January 2, 2007, Third-Party Defendants, TCSweb Communications, Inc.

("TCSweb") and CSI Realty LLC ("CSI Realty"), moved for reconsideration of, and for

relief from pursuant to Rule 60(b)(6) of the Federal Rules of Civil Procedure, this Court's

December 14, 2006 judgment in favor of Plaintiff on the grounds that the judgment was

erroneous and will be an extreme and undue hardship for TCSweb and CSI Realty.

Third-Party Defendants' motion is denied.

## I.      BACKGROUND

       On March 31, 2006 in this case, a default judgment was entered in favor of The

Hewlett Packard Company ("HP") against Defendant, The Computer Specialists, Inc.

("TCS") for $439,798.92.  In pursuing enforcement, HP retained an investigative firm

that produced two reports, dated May 9, 2006 and June 12, 2006.  On September 15,

2006, based on the information in the reports, HP moved that TCSweb and CSI Realty be

held liable for the default judgment on the theory that they were alter egos of TCS.  On

December 14, 2006, after receiving papers in support from each party,[1] this Court heard

oral argument on Plaintiff's motion and rendered oral judgment in favor of Plaintiff.[2]  On

January 2, 2007, Third-Party Defendants moved for reconsideration pursuant to Local

Civil Rule 6.3 and for relief from the judgment pursuant to Rule 60(b)(6) of the Federal

Rules of Civil Procedure.[3]  The Court ordered an evidentiary hearing and, on February 28

and March 1, 2007, Charles P. Kokoska testified.[4]

### A.    TCS

TCS was formed in September 1989 and engaged in the sale and maintenance of

computer hardware and software, as well as limited consulting and training related to the

hardware and software until December 2005, when a unanimous resolution by the

shareholders directed that the corporation be dissolved as soon as practically possible.

(Charles Kokoska Aff. I ¶ 1-2.)

The President, and owner of approximately 30.7% of the outstanding stock of

TCS is Charles P. Kokoska.  (Id. ¶ 1.)  His wife Donna Kokoska, the former CFO and

---

[1] Plaintiff's submissions included: (1) Aff. of Lynn E. Judell In Supp. of Mot. for J. against TCSweb Communications, Inc. and CSI Realty LLC, dated Sep. 15, 2006 with Exs. A-L ("9/15 Judell Aff."); (2) Aff. of Lynn E. Judell In Further Supp. of HP's Mot. for Order Directing TCSweb Communications, Inc. and CSI Realty LLC to Pay J. Against TCS, dated Dec. 7, 2006 with Ex. A ("12/7 Judell Aff."); and (3) Aff. of Kenneth Higman In Further Supp. of Mot. for J. Against TCSweb Communications, Inc. and CSI Realty LLC, dated Dec. 6, 2006 with Exs. A-F ("12/6 Higman Aff.").

Third-Party Defendants' submissions included: (1) Decl. of Stanley H. Fischer dated Nov. 27, 2006 with Exs. A-M ("Fischer Decl."); (2) Aff. of Charles P. Kokoska dated Nov. 20, 2006 ("Charles Kokoska Aff. I"); (3) Aff. of Donna J. Kokoska dated Nov. 20, 2006 ("Donna Kokoska Aff."); (4) Aff. of Chares J. Hereth IV dated Nov. 20, 2006 ("Hereth Aff."); and (5) Aff. of Shirley M. Petrie dated Nov. 20, 2006 ("Petrie Aff.").

[2] The judgment was signed on Jan. 5, 2007.

[3] In support of their motion for reconsideration, Third-Party Defendants submitted three affidavits by Charles Kokoska, dated Dec. 28, 2006 with Exs. A-M ("Charles Kokoska Aff. II"), Jan. 25, 2007 with Exs. A-H ("Charles Kokoska Aff. III"), and Feb. 5, 2007 ("Charles Kokoska Aff. IV").  Plaintiff submitted:  (1) Aff. of Kenneth Higman In Opp. to the Mot. of TCSweb Communications, Inc. and CSI Realty LLC for Recons. and/or Relief from the J., dated Jan 18, 2007 with Ex. A ("1/18 Higman Aff."); (2) Aff. of Lynn E. Judell In Opp. to the Mot. of TCSweb Communications, Inc. and CSI Realty LLC for Recons. and/or Relief from the J., dated Jan. 19, 2007 with Exs. A-D ("1/19 Judell Aff."); and (3) Aff. of Kenneth Higman In Further Opp. to the Mot. of TCSweb Communications, Inc. and CSI Realty LLC to Vacate the J., dated Feb. 1, 2007 with Exs. A-B ("2/1 Higman Aff.").

[4] Citations to the evidentiary hearing transcript are represented by "Tr. _."

current Director, owns approximately 50.4% of the outstanding stock. (Donna Kokoska Aff. ¶ 1.) Charles Hereth IV, a former Vice President and current Director, controls approximately 14.2% of the outstanding stock. (Hereth Aff. ¶ 1.)[5] Shirley Petrie, a former Vice President and current Director, owns approximately 3.6% of the outstanding stock. (Petrie Aff. ¶ 1.)[6]

### B.    Formation of CSI Realty and the Lease Agreements

In October 1998, approximately nine years after TCS commenced business, its major owners formed CSI Realty, a New York Limited Liability Corporation, to acquire, manage, and maintain 307-317 Oriskany Boulevard, Whitesboro, NY 13492 ("Clock Tower Plaza") with TCS as the major tenant. (Charles Kokoska Aff. I ¶ 3; Fischer Decl. Ex. L at 1.)[7] A month later, on November 20, 1998, TCS entered into a fifteen-year lease with CSI Realty requiring TCS to pay monthly rent in addition to maintenance costs and a share of the property taxes on Clock Tower Plaza. (Third-Party Defs.' Ex. 1 ("Lease Agreement").) The lease was negotiated with separate counsel representing TCS and CSI Realty. (Tr. 10-11.) CSI Realty's mortgagor for Clock Tower Plaza required certain clauses in the lease between CSI Realty and TCS to ensure that CSI Realty could obtain suitable rent from TCS. (Charles Kokoska Aff. II ¶ 4.)[8] The Lease Agreement provides:

> (3) If LESSEE shall fail to pay LESSOR any rent or additional rent when the rent shall become due and shall not make the payment within a three

---

[5] Half of Mr. Hereth's shares are owned by his wife. (Hereth Aff. ¶ 1.)
[6] Although the evidence does not account for the remaining 1.1% of TCS's stock, no additional stockholders are mentioned.
[7] Charles Kokoska is the Operating Manager and owner of 31% of CSI Realty's membership shares. (Charles Kokoska Aff. I ¶ 3.) Donna Kokoska, the Treasurer/Manager, owns approximately 55% of the outstanding membership shares. (Donna Kokoska Aff. ¶ 3.) Charles Hereth IV, the Secretary/Manager, controls approximately 14% of the membership shares. (Hereth Aff. ¶ 3.) Of the forty-two employees previously employed by TCS, none work for CSI Realty. (Charles Kokoska Aff. I ¶ 6.)
[8] The mortgagor also required that CSI Realty maintain a suitable checking account with the mortgagor. (Charles Kokoska Aff. II ¶ 4; Tr. 15-16.)

day grace period after written notice thereof by LESSOR to LESSEE [it shall constitute a default or breach of this lease].

    a. In the event of such nonpayment, and only when no other breach or default exists, LESSEE shall have the option, after curing said breach, to expand such grace period and all others afforded for in this lease agreement, to a length mutually acceptable between LESSOR and LESSEE provided LESSEE establishes a suitable method of security acceptable to LESSOR and/or LESSOR'S mortgagor for insuring the payment of future rents and additional rents as specified herein.

(Lease Agreement § 12(3).)  Based on this provision, at a later time CSI Realty and TCS entered into a written agreement to satisfy the mortgagor's request, which allowed CSI Realty to garnish or marshal rent from TCS's operating account.  (Tr. 136-37.)[9]  The attorney who drafted this agreement represented CSI Realty.  (Id.)  TCS did not retain its own attorney to review the agreement.  (Tr. 137.)

Originally, TCS leased 23,000 square feet of the plaza's 50,000 plus square feet. (Tr. 12.)  This was later increased to 34,000 square feet.  (Tr. 12-13.)  On June 27, 2005, following tardy rent payments by TCS, CSI Realty executed a Resolution of Board of Directors that called for tenant TCS to vacate its space within ninety days and move into a smaller area of the plaza for the balance of the lease period.  (Fischer Decl. Ex. B at 6; Tr. 151-52.)  During the period from June 2005 to December 2005, CSI Realty was paid $8000 monthly for TCS's rent, in addition to periodic property taxes and maintenance fees.  (Charles Kokoska Aff. II ¶ 10; Tr. 13.)  On November 30, 2005, CSI Realty executed a Resolution of Board of Directors to evict TCS within thirty days.  (Fischer Decl. Ex. B at 7; Tr. 14.)

From 1999 until December 2005, TCS was the major tenant at Clock Tower Plaza.  (Fischer Decl. Ex. L at 2-3.)  TCS owned the telephone system for the entire

_____

[9] The written agreement was never produced in this litigation.  (Tr. 136.)

plaza, (Tr. 101), and could be reached through the plaza's central telephone number, (Fischer Decl. Ex. L at 2-3).[10]  Due to TCS's inability to pay full rent while occupying space at Clock Tower Plaza, TCS has a current outstanding debt of over $100,000 to CSI Realty.  (Tr. 151-52, 178-79.)

### C.    CSI Realty's "9942" TCS Operating Account[11]

In 2004, the mortgagor on Clock Tower Plaza had adopted more stringent evaluation criteria.  (Charles Kokoska Aff. II ¶ 5.)  Due to inconsistency in TCS's rent payments, the mortgagor requested that CSI Realty exercise its option under the lease to garnish rent from TCS when appropriate.  (Id.)[12]  TCS decided to "put all the money together" and use CSI Realty's 0466 Account as TCS's operating account instead of TCS's own 0425 Account.  (Tr. 100.)  However, TCS's attorney and accountant "went absolutely nuts [and said t]here is no way we can let you do that."  (Id.)  Instead, the accountant said "let's get separate accounts and we will do it that way."  (Id.)

On November 17, 2004, TCS executed a "Special Resolution of Board of Directors Marshaling TCS Checking Account" signed by Donna Kokoska as Secretary for TCS:

> RESOLVED, That the Corporation acting in its best interests to maintain adequate and suitable space for continued operations, and having found no other such alternative space or option readily available for same, and <u>having previously agreed to such conditions as a special and required</u>

---

[10] All companies located in Clock Tower Plaza share the same mailing address and are reached through the TCS-owned phone system by the plaza's central telephone number; however, each company occupies distinct office space and has a unique direct telephone number.  (Fischer Decl. Ex. L at 2-3; Tr. 101.)

[11] There are four bank accounts pertinent to this case: the accounts of TCS (the "0425 Account"), TCSweb (the "6019 Account"), and CSI Realty (the "0466 Account"); as well as a fourth account designated as "CSI / THE COMPUTER SPECIALISTS OPERATING ACCT." but opened in the name of, and controlled by, CSI Realty pursuant to special corporate resolutions entered into on November 17, 2004 (the "9942 Account").  (Fischer Decl. Exs. M-1 at 1-2; M-2 at 3.)

[12] The Lease Agreement does not contain any such terms, but Mr. Kokoska testified that a separate written agreement – not produced in this litigation – was drawn by CSI Realty's attorney and entered into by TCS and CSI Realty.  (Tr. 136-37.)

<u>term of the existing lease in the event of a continued breach thereof which can not or has not been reasonably cured</u>, does hereby approve the demand of its Landlord ([CSI Realty]) <u>to effectively marshal and exercise specific control</u> over the Corporation's primary checking/operating account as set forth under the special lease term and conditions.

        RESOLVED, FURTHER, That CSI [Realty] shall be authorized to open a separate and distinct checking account exclusively for use as an operating account of TCS and no other, into which appropriate TCS funds shall be deposited and used, subject to the reasonable oversight of CSI [Realty], to fulfill TCS's routine financial obligations.

(Fischer Decl. Ex. B at 4 (emphasis added); Pl's Ex. 2.)  The same day, CSI Realty

entered into a corresponding "Special Resolution of Board of Directors" signed by

Secretary Charles Hereth:

        RESOLVED, That the Company shall, as soon as practically possible exercise its option under the special terms and conditions of its lease with tenant TCS to make a demand upon same to voluntarily submit to and allow the Company to marshal and/or exercise fair and equitable oversight of tenant's checking account in order to insure reasonable and adequate protection of the Company's substantial investment and equity on its real estate and property of which the tenant currently has possession and control.

        RESOLVED, FURTHER That the Company shall take this action no later than 30 days after the date this resolution is adopted, or failing tenant's voluntary submission thereto, directly proceed with a course of action to evict said tenant as stipulated in the lease for continued breach without cure of its lease obligations.

        RESOLVED, FURTHER That the pursuit of any action to marshal shall be done through the establishment of a separate and distinct bank account used solely and exclusively for transactions benefiting the tenant as stipulated within the special terms and conditions of the lease and that such action be specifically limited in duration as may be appropriate to clear any arrears.

(Fischer Decl. Ex. B at 5; Pl's Ex. 3.)[13]

---

[13] Charles Kokoska states by affidavit: "Through individual corporate resolutions (copies of which were provided to the bank involved), CSI [Realty] and TCS agreed that [CSI Realty's] authority over this account would be strictly limited to withdrawing only the amount of rent stipulated in the lease and only on those instances when CSI [Realty] notified TCS and the bank in writing 10 days in advance of its intent to make such withdrawal for failing to pay rent when due."  (Charles Kokoska Aff. II ¶ 5; <u>see</u> Tr. 95.)  No such arrangement with the bank is reflected in either of the two special corporate resolutions provided to the Court or in the Lease Agreement presented at the evidentiary hearing.

For a period of approximately forty to forty-five days before CSI Realty's newly opened 9942 Account was ready for use, TCS used CSI Realty's main account, the 0466 Account, as its primary operating account to satisfy CSI Realty's mortgagor.  (Charles Kokoska Aff. III ¶ 20; Tr. 105.)  During this period, 239 checks were processed on behalf of TCS and deposited into CSI Realty's 0466 Account.  (Charles Kokoska Aff. III ¶ 20.)[14]

In December 2004, TCS ceased using its primary 0425 Account.  (Fischer Decl. Ex. M-1 at 1-2.)  The balance was transferred to CSI Realty's 9942 Account as soon as it was fully set up.  (Id.)  Subsequently, the 9942 Account was used to transact all of TCS's business, while TCS's 0425 Account, having a balance of around $2000, became dormant except for bank service charges.  (Id.)[15]

Bank deposit slips for the 9942 Account are headed "CSI REALTY LLC / OPERATING ACCOUNT."  (See, e.g., Fischer Decl. Ex. M-2 at 4.)  Checks for the 9942 Account are headed "CSI / THE COMPUTER SPECIALISTS OPERATING ACCT." without any indication that it is a CSI *Realty* Account.  (See, e.g., id. Ex. M-2 at 3.)

**D.     TCS's Relationship with HP**

TCS had been a reseller of HP products since 2003 and maintained a number of accounts with HP for different purposes.  (12/6 Higman Aff. ¶ 5.)[16]  TCS processed three major categories of orders with HP: (1) direct orders where TCS purchased merchandise from HP in its own name and then resold the merchandise to end users; (2) influencer orders where TCS assisted end users in directly placing orders with HP and HP paid TCS

---

[14] HP has presented no evidence that any of the funds deposited in the 0466 Account were not applied to TCS obligations by CSI Realty.

[15] The dormant 0425 Account was kept open on advice of counsel.  (Fischer Decl. Ex. M-1 at 1-2.)

[16] Pursuant to five or six written agreements, TCS had several business arrangements with HP in 2004.  (Tr. 21-22, 24; Third-Party Defs.' Ex. 4.)

a commission for its services; and (3) hybrid orders, known as "GEM" orders, for an HP-approved list of eighteen to twenty-four customers, most commonly school districts, for whom HP would offer below-market rates.  (Charles Kokoska Aff. II ¶¶ 12-13; Tr. 60-63, 75.)

Mr. Kokoska testified that for GEM orders the following steps took place: (1) TCS would place the order online with HP for the school district, (Tr. 70), (2) HP would return to TCS a summary of the order as it sat in their system, (id.), (3) Mrs. Kokoska would "sign [the summary] as the authorized representative" and return it to HP by fax with a copy of the school's purchase order, (Tr. 71), (4) TCS would invoice the school district, (Tr. 73), and (5) HP would invoice TCS, (id.).  GEM orders were limited and controlled by HP to prevent "gray marketing" since the school districts received below-market rates for the merchandise.  (Tr. 64.)  TCS began placing GEM orders in this manner with HP in early 2004.  (Tr. 85.)

On June 3, June 13, and June 16, 2005, e-mails from Ken Higman to Donna Kokoska requested a commitment to pay invoices outstanding of approximately $195,000.  (Aff. of Ken Higman In Supp. of Mot. for Default J., dated Mar. 14, 2006 ("3/14/06 Higman Aff."), Ex. C.)  While HP was initiating these collection efforts, TCS received an unsolicited order from Schuyler-Chemung-Tioga Boces ("SCT Boces") for HP computers and related equipment totaling $198,730.05 (Third-Party Defs.' Ex. 11; Tr. 143.)  Donna Kokoska placed the order online and received an acknowledgment of the order from HP on June 6, 2005 at 8:11 a.m.  (Third-Party Defs.' Ex. 11.)  The acknowledgment described the equipment ordered and stated that TCS was the

"Influencer1."  (Id.; Tr. 117.)[17]  Mrs. Kokoska approved the order by signing and

returning it to HP.  (Third-Party Defs.' Ex. 11; Tr. 83.)

    On June 21, 2005, HP notified TCS by e-mail that due to non-payment of invoices

all of TCS's accounts were being placed on credit hold.  (Tr. 123-25.)  The e-mail stated:

"As we have not had a response to our prior requests for payment, we have no choice but

to act on the nonpayment.  I [Ken Higman] have requested a credit hold on all Computer

Specialists accounts, including your parts account, until further notice. . . ."  (3/14/06

Higman Aff. Ex. C at 1.)  Mr. Kokoska testified that he did not understand the e-mail,

and that he believed the credit hold was only being placed on TCS's direct ordering and

"Parts" accounts, and that TCS was still free to place GEM orders on credit.  (Tr. 126-

34.)[18]  HP's position is that the credit hold

> allowed TCS to continue to place orders for the PartnerDirect Account,
> whereby HP would bill the end users directly, [and] permitted TCS to
> have access to web ordering (with end user direct billings) to allow TCS to
> earn influencer commissions so that the commissions could be applied to
> the open invoices.[19]  However, TCS abused its web ordering privileges by
> intentionally entering orders noting end user direct billings while at the
> same time instructing end users to issue their purchase order and
> subsequent payment to TCS directly.

(2/1 Higman Aff. ¶¶ 3-4.)

---

[17] This order differs from Third-Party Defs.' Exs. 7-10 utilized by Mr. Kokoska to demonstrate that in 2004 HP had allowed TCS to arrange shipments to 18-24 school district customers in which TCS, and not HP, would invoice those customers for products shipped by HP.  Examination of these four exhibits shows that in those earlier orders, TCS was not listed as an "Influencer," but was described as an "Agent."  Mr. Kokoska testified that on influencer orders HP would bill the customer and TCS would only get a commission.  (Tr. 117; see Third-Party Defs.' Ex. 4, Influencer Addendum.)

[18] This testimony of Mr. Kokoska is inconsistent with his earlier affidavit.  See Charles Kokoska Aff. IV ¶ 4 ("HP became concerned about TCS's ability to maintain timely payment terms on its remaining HP accounts after the continued lack of a satisfactory resolution to its outstanding 'GEM' account balance with HP which resulted in Mr. Higman requesting the credit hold on all TCS's primary accounts . . . .") (emphasis added); id. ¶ 13 ("Simply stated, the majority of negotiations between HP and TCS regarding overdue balances occurred prior to June 2005.  Many of these addressed disputes between HP and TCS over funds HP owed TCS for more than a year as well as disputes about the amount of funds TCS owed HP on its ONLY overdue account (the 'GEM' account).").

[19] Such orders do not expose HP to any additional credit risk with respect to TCS.

The following day, June 22, 2005, TCS placed an unsolicited order from Madison Oneida Boces ("MO Boces") online with HP, directing HP to invoice MO Boces.  (12/6 Higman Aff. ¶ 11.)  Upon receiving confirmation of the order from HP, Mrs. Kokoska, as with the SCT Boces order, acknowledged this order as an influencer order through her authorized signature, (Third-Party Defs.' Ex. 12; Tr. 86), and HP subsequently shipped the goods and issued its invoice for $56,240 to MO Boces.  (12/6 Higman Aff. Ex. C.) However, TCS had issued its own invoice to MO Boces dated June 17, 2005 for $56,320. (Id.)  MO Boces paid TCS's invoice on July 27, 2005.  (Id.)  HP never received payment for this order from either TCS or MO Boces.[20]  Upon hearing that MO Boces and SCT Boces had previously paid TCS, HP has not pursued these school districts.

### E.    Formation of TCSweb

In 2004, TCS began to provide high speed telecommunications connectivity via wireless technology including the sales and maintenance of associated equipment. (Charles Kokoska Aff. I ¶ 4.)  Around a year later, in September 2005, TCS severed this telecommunications portion of its business to form TCSweb.  (Id.)[21]  TCSweb also has a limited amount of business in the service and support of computer hardware and networks.  (Id.)  TCSweb currently serves approximately thirty former clients of TCS. (Tr. 110.)  TCSweb also rents office space at Clock Tower Plaza from CSI Realty. (Charles Kokoska Aff. II ¶ 10.)

---

[20] On July 26, 2005, HP was issued $50,000 from CSI Realty's 9942 Account in partial payment of the outstanding balance TCS owed HP on the SCT Boces order.  (Fischer Decl. Ex. E at 7.)

[21] The President, and owner of 35% of the TCSweb outstanding stock, is Charles Kokoska.  (Charles Kokoska Aff. I ¶ 4.)  Donna Kokoska, the CFO and Treasurer, owns approximately 51% of the outstanding stock.  (Donna Kokoska Aff. ¶ 4.)  Shirley Petrie, a Vice President and Secretary, controls approximately 14% of the outstanding stock.  (Petrie Aff. ¶ 4.)  Of the forty-two employees previously employed by TCS, two currently work for TCSweb.  (Charles Kokoska Aff. I ¶ 6.)

Although CSI Realty's 9942 Account was the primary account for receipts and disbursements of TCS during 2005, a number of checks payable to TCSweb were deposited in this account in late 2005.  (Fischer Decl. Ex. M-1 at 4.)[22]  Third-Party Defendants admit that these checks were in payment for services performed by TCSweb, but maintain that the checks were properly allocated to TCS since the contracts under which the services were performed were entered into with TCS before TCSweb was separately incorporated.  (Id. Ex. M-1 at 2-3.)

###    F.       The December 14, 2006 Decision

The Court rendered judgment against CSI Realty and TCSweb in favor of HP finding that equity called for piercing the corporate veil on the grounds that (1) TCS, CSI Realty, and TCSweb were all controlled by the Kokoskas, who held more than 80% of the ownership shares of each entity; (2) CSI Realty took control of the assets and receipts of TCS, including amounts due to HP,[23] to secure the rent owed by TCS; (3) TCS's primary bank account with a balance of $2000 or less was dormant for all of 2005; and (4) payments to TCSweb were deposited into the TCS operating account – the 9942 Account – controlled by CSI Realty.

---

[22] Mr. Kokoska states that TCS sought and received bank approval for these deposits since the bank typically prohibited third-party deposits into corporate accounts, (Charles Kokoska Aff. II ¶ 6); however, no corroborating evidence was submitted.

[23] The Court specifically identified the SCT Boces order for over $280,000 and the MO Boces order for $56,040, which were both placed in the Summer of 2005.  The resulting funds (actually $198,730.05 and $56,320) were received by TCS and deposited into CSI Realty's 9942 Account.  Only $50,000 out of a total of approximately $250,000 on these orders was repaid to HP at a time when TCS had accounts payable to HP of approximately $450,000.  (See 2/1 Higman Aff. ¶ 7; 3/14/06 Higman Aff.)

## II.     DISCUSSION

### A.     Standard of Review

#### 1.     Reconsideration and Relief from Judgment under Rule 60(b)

Plaintiff's motion for reconsideration dated January 2, 2007 was made pursuant to Rule 60(b)(6) of the Federal Rules of Civil Procedure and Rule 6.3 of the Local Civil Rules.

Rule 60(b) of the Federal Rules of Civil Procedure permits this Court to relieve a party from a final judgment for the following reasons: 1) mistake, inadvertence, surprise, or excusable neglect; 2) newly discovered evidence; 3) fraud; 4) the judgment is void; 5) the judgment has been satisfied; or 6) any other reason justifying relief from the operation of the judgment.  "Generally, courts require that the evidence in support of the motion to vacate a final judgment be 'highly convincing,' that a party show good cause for the failure to act sooner, and that no undue hardship be imposed on other parties."  See Kotlicky v. U.S. Fidelity & Guar. Co., 817 F.2d 6, 9 (2d Cir. 1987) (citations omitted).

#### 2.     Piercing the Corporate Veil

"Under New York law, a court may pierce the corporate veil where 1) the owner exercised complete domination over the corporation with respect to the transaction at issue, and 2) such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil."  MAG Portfolio Consult, Gmbh v. Merlin Biomed Group LLC, 268 F.3d 58, 63 (2d Cir. 2001).

In determining whether there was domination, a fact-specific inquiry, courts are entitled to consider numerous factors, including

(1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and

> personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the degree of discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arms length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of the corporation's debts by the dominating entity, and (10) intermingling of property between the entities.

MAG Portfolio, 268 F.3d at 63.  "Because 'disregarding corporate separateness as an equitable remedy is one that differs with the circumstances of each case,' no single factor or even combination of factors is dispositive.  '[T]he general principle followed by the courts has been that liability is imposed when doing so would achieve an equitable result.'"  Network Enters., Inc. v. APBA Offshore Prods., Inc., 427 F. Supp. 2d 463, 488-89 (S.D.N.Y. 2006) (quoting Am. Protein Corp. v. AB Volvo, 844 F.2d 56, 60 (2d Cir. 1988) and William Wrigley Jr. Corp. v. Waters, 890 F.2d 594, 601 (2d Cir. 1989)).

Courts have found that equity required the disregard of the corporate form in circumstances where domination of a corporation was purposely used to transfer assets to avoid paying creditors.  See, e.g., Solow v. Domestic Stone Erectors, Inc., 703 N.Y.S.2d 94 (N.Y. App. Div. 1st Dep't 2000) (holding that if Plaintiffs can show that the use of dominion and control over three corporations to transfer assets of the debtor corporation to the other two corporations was designed to achieve the fraudulent purpose of preventing plaintiffs from satisfying their judgment rather than based on a legitimate business judgment then the corporations can be treated as a single personality for the purpose of enforcing the judgment); Austin Power Co. v. McCullough, 628 N.Y.S.2d 855 (N.Y. App. Div. 3d Dep't 1995) (finding that piercing of the corporate veil was justified where defendant operated two corporations as one entity by commingling assets, conducting operations from the same office and paying management fees from the debtor corporation to the second corporation which served to divert funds away from creditors).

### B.      Equity and the Disregard of the Corporate Form

The relevant inquiry is whether the domination of TCS through the intertwining of TCS, TCSweb, and CSI Realty purposefully caused a fraud or wrong that injured HP to the extent that equity demands disregard of the corporate form.  This leads to a two-part analysis: (1) to what extent was TCS dominated by the other two entities or the Kokoskas, and (2) was domination used for the purpose of causing a fraud or wrong that injured HP.  MAG Portfolio, 268 F.3d at 63.

### 1.      Domination of TCS

At first glance, the three corporations would be considered entities free of domination.  First, TCS, TCSweb, and CSI Realty are separate New York corporations.  Second, the companies are distinct in the type of business they purport to engage in: TCS engaged in the sale and maintenance of computer hardware and software as well as related consulting; TCSweb provides high speed telecommunications connectivity via wireless technology including the sales and maintenance of associated equipment; and CSI Realty managed, maintained and leased commercial real estate properties, specifically Clock Tower Plaza.  (Charles Kokoska Aff. I ¶¶ 1, 3-4.)  Third, although all three entities were located in Clock Tower Plaza owned by CSI Realty, used the same mailing address, and were reachable by the same phone number through the TCS-owned phone system for the plaza, all three had separate office space and distinct direct phone numbers.  (Fischer Decl. Ex. L; Tr. 101.)

Delving further into the facts, however, yields substantial evidence of domination.  First, there is a high overlap in ownership and officers among the three companies.  Charles and Donna Kokoska held a controlling ownership in all three companies: 81.1%

of TCS, 86% of TCSweb, and 86% of CSI Realty.  (Charles Kokoska Aff. I ¶¶ 1, 3-4; Donna Kokoska Aff. ¶¶ 1, 3-4.)[24]  Charles Kokoska was the head of each entity: Operating Manager of CSI Realty and President of both TCS and TCSweb.  (Charles Kokoska Aff. I ¶¶ 1, 3-4.)  Donna Kokoska was the financial head of each entity: Treasurer/Manager of CSI Realty and CFO of TCS and TCSweb.  (Donna Kokoska Aff. ¶¶ 1, 3-4.)

Second, examination of the bank records reveals direct commingling of funds. Beginning in late 2004, there was a forty to forty-five day period when TCS was operated directly and exclusively by CSI Realty's main bank account.  (Charles Kokoska Aff. III ¶ 20; Tr. 105.)  Thereafter, all of TCS's business was transacted solely through a bank account – the 9942 Account – opened in the name of, and controlled by, CSI Realty. (See Fischer Decl. Exs. B at 4-5, M-1 at 1-2; Tr. 107.)  In addition, numerous checks remitted to TCSweb – after it was incorporated in September 2005 and TCS's business and good will were assigned to it – were deposited directly into CSI Realty's 9942 Account.  (Fischer Decl. Ex. M-1 at 2-4.)[25]  This is further evidence that the three companies were not dealing at arm's length.

Third, the very unorthodox formation of the 9942 Account by CSI Realty leaves no doubt that TCS and CSI Realty did not deal with one another at arm's length.   TCS's corporate resolution authorizing the corporation's finances to be controlled by CSI Realty was passed pursuant to a written agreement between TCS and CSI Realty drafted by, and only reviewed by, an attorney representing CSI Realty.  (Tr. 136-37.)  In addition, TCS's

---

[24] The remaining ownership interest was controlled by three other individuals.
[25] Even though Mr. Kokoska states these payments were for work done by TCSweb in satisfaction of contracts belonging to TCS, it was improper to directly deposit checks remitted to TCSweb into the account for TCS.  If the entities had been dealing at arm's length, the checks would have been deposited into TCSweb's own account, and TCSweb would subsequently pay TCS.

resolution was signed on behalf of TCS by its Secretary Donna Kokoska, the Treasurer/Manager and 55% owner of CSI Realty.  (Fischer Decl. Ex. B at 4; Donna Kokoska Aff. ¶ 3.)

Considering the overlap of ownership and officers among the three companies, the commingling of funds among all three entities, the unorthodox creation of the 9942 Account, and CSI Realty's direct control over TCS's finances throughout 2005 subject to the Special Corporate Resolutions, there is sufficient evidence to establish domination over TCS and TCSweb by CSI Realty and the Kokoskas.  MAG Portfolio, 268 F.3d at 63.

### 2.    Fraud or Wrong to HP

The second step of the veil-piercing analysis is to determine whether the domination of TCS was used to perpetrate a fraud or wrong on HP.  A showing of domination is insufficient to merit disregarding the corporate form; "[t]he domination must have occurred '*for the purpose* of committing a wrong.'"  Sahu v. Union Carbide Corp., No. 04 Civ. 8825, 2006 WL 3377577, at *9 (S.D.N.Y. Nov. 20, 2006) (quoting MAG Portfolio, 268 F.3d at 64).

In the fall of 2004, a number of developments took place around the same time: (1) around September, TCS was "closing down, winding down the business," (Tr. 105; see Fischer Decl. Ex. M-1 at 1); (2) on November 6, a judgment, still outstanding, was entered against TCS for legal fees in the amount of $16,035 incurred in litigation over the closing of TCS's Rochester office, (Judell Aff. Ex. B. at 5)[26]; (3) in November, the mortgagor on Clock Tower Plaza instituted more stringent banking requirements on CSI Realty since TCS, its main tenant, had been in "continued breach [of its lease with CSI

---

[26] Mr. Kokoska testified that the judgment did not influence the decision to wind down TCS's business. (Tr. 141-42.)

Realty] which cannot or has not been reasonably cured" (Fischer Decl. Ex. B at 4); (4) later in November TCS ceased using its own bank account – which was left open with a nominal balance – and began operating out of CSI Realty's bank account, the 0466 Account, (Charles Kokoska Aff. III ¶ 20; Tr. 105); and (5) in December, CSI Realty opened the 9942 Account to manage the receipts and disbursements of TCS in 2005, (Fischer Decl. Ex. M-1 at 1-2).  There is no evidence that HP was put on notice of these steps by TCS.[27]

The preponderance of the evidence is that through these developments the Kokoskas exercised their domination over TCS at the expense of HP and other TCS creditors.  In addition, by taking control over TCS's finances,[28] CSI Realty not only satisfied its mortgagor and prevented foreclosure, but also ensured that CSI Realty would receive rent payments from TCS in preference to making payments to other creditors including HP with whom TCS ostensibly was continuing to do business as usual.

After the decision was made to wind down TCS's business, TCS continued to increase its accounts payable to HP by placing orders with HP, billing the end user, and depositing the proceeds into CSI Realty's 9942 Account.  (See e.g., 12/6 Higman Aff. Exs. B, C.)  By e-mails on June 3 and June 13, 2005, HP asked TCS to agree to make payments of $195,879.60 by the end of the month for past-due software, licenses, and equipment invoices.  (3/14/06 Higman Aff. Ex. C.)  Nevertheless, on June 6 and 22,

---

[27] The checks HP received from the Kokoskas obfuscated CSI Realty's domination of TCS.  The checks were headed "CSI / THE COMPUTER SPECIALISTS OPERATING ACCT." even though the deposit slips for the same account were headed "CSI REALTY LLC / OPERATING ACCOUNT."  The initials "CSI" are shared by both TCS – "The Computer Specialists Inc." – and CSI Realty, and are used to refer to either entity.  For example, a TCS corporate officer made out a check to TCS "abbreviating 'CSI' in the Payee field for 'Computer Specialists, Inc.'"  (Fischer Decl. Ex. M-1 at 5; see also Charles Kokoska's testimony throughout (referring to TCS as "Computer Specialists").)

[28] Notably, CSI Realty took control over TCS's finances uninhibited by any corporate resolutions on November 22, 2004 for a period of forty to forty-five days prior to the establishment of the 9942 Account.  (Charles Kokoska Aff. III ¶ 20.)

2005,[29] TCS placed two orders through HP's online ordering system for SCT Boces and MO Boces, which HP acknowledged as – and Mrs. Kokoska confirmed as – influencer orders.  (Third-Party Defs.' Exs. 11-12.)  On influencer orders, HP would bill the customer and TCS would receive a commission.  (Tr. 117.)[30]  When HP invoices sent directly to the purchasers became due – 30 days after shipment – HP found that TCS had invoiced the customer and had already been paid on the invoices.  (12/6 Higman Aff. ¶¶ 9-11.)  These payments from SCT Boces and MO Boces were deposited into CSI Realty's 9942 Account, with the funds being used to repay creditors, including CSI Realty for TCS's rent, in preference to HP.

Additionally, after HP placed the June 21, 2005 request for a credit hold on TCS's accounts, and while business relations between the two companies continued to deteriorate, the telecommunications portion of TCS's business launched in Fall 2004 was transferred to TCSweb upon its separate incorporation in September 2005.  (Fischer Decl. Ex. M-1 at 2; Charles Kokoska Aff. I ¶ 4.)  This step, in effect, transferred the viable business and good will of TCS in the telecommunications field to TCSweb and shielded the future profits of TCS's telecommunications business from any future judgments from TCS's creditors, including HP.  (Tr. 110.)

On the basis of all these facts, equity demands that the corporate form be disregarded in this case.  MAG Portfolio, 268 F.3d at 63; see Solow 703 N.Y.S.2d at 94. CSI Realty and TCSweb remain liable, pursuant to this Court's December 14, 2006 decision, for the March 31, 2006 default judgment against TCS.

---

[29] The June 22, 2006 order was confirmed the day after TCS had been notified by e-mail that a credit hold had been requested on its ordering capabilities with HP on June 21, 2006.  (Tr. 123-25.)
[30] Web orders on behalf of end users, where TCS could earn influencer commissions, were permitted by HP during this period.  (2/1 Higman Aff. ¶ 4.)

## III.    CONCLUSION

Third-Party Defendants' motion for reconsideration and/or relief from this

Court's December 14, 2006 judgment is denied.  The Kokoskas used their domination

over TCS for the purpose of causing a wrong to HP, and for the benefit of CSI Realty and

TCSweb.  Accordingly, equity demands that CSI Realty and TCSweb be responsible for

the default judgment against TCS.

IT IS SO ORDERED.

Dated:  New York, New York
        May 15, 2007

Robert P. Patterson, Jr.
U.S.D.J.

Copy of this Order sent to:

Andrews Kurth LLP
450 Lexington Avenue, 15th Floor
New York, New York 10017
Attn:   Lynn E. Judell
        Cassandra Porsch
Tel:    212-850-2800
Fax:    212-850-2929

Fischer and Burstein, P.C.
98 Cutter Mill Road
Suite 294N
Great Neck, New York 11021
Attn:   Stanley H. Fischer
        David S. Fischer
Tel:    516-829-1900
Fax:    516-829-5973